KAMROWSKI and others, Appellants, v. STATE (State Highway Commission), Respondent.

*May 10—June 7, 1966.*

258

For the appellants there was a brief by *Hale, Skemp, Hanson, Schnurrer & Skemp* of La Crosse, and oral argument by *Thomas H. Skemp*.

For the respondent the cause was argued by *William H. Wilker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

FAIRCHILD, J.  Plaintiffs contend that "scenic easements" cannot constitutionally be taken from them by the state even though just compensation be determined and paid. Their basic attack appears to be that public enjoyment of scenic beauty of certain land is not a public use of such land and that there are not sufficient standards limiting the action of the commission.

There is a considerable body of legislative history which clarifies the concept of "scenic easement."

In 1939, the legislature enacted sec. 84.105, Stats.[1] It declared the intent of assenting to any act of Congress authorizing the development of any national parkway located within Wisconsin and authorized the commission to perform duties required of the state, and to acquire necessary easements, by condemnation as well as by gift or purchase.

In 1949, Congress directed a survey of a national parkway along the Mississippi river.[2]  The report thereon, entitled "Parkway for the Mississippi," was transmitted to Congress November 28, 1951, by the bureau of public roads and national park service.  It said, at page 10, "The essence of the parkway concept is to provide a parklike corridor which insulates the motor road from uncontrolled development along the roadsides" and pointed out that although many of the roadsides along the river were "relatively clear of ribbon development," land con-

[1] Ch. 138, Laws of 1939.
[2] 63 Stat., ch. 500, Public Law 262, 81st Congress.

trols were essential because ribbon development will begin as tourists arrive in greater numbers.

On page 11 there appeared the following discussion of scenic easements:

"Outright purchase of the farm scene, widespread through the valley, would be unnecessary. Instead, scenic easements or reservations would be sought, averaging 300 feet wide, along both sides of the construction right-of-way. There would be purchased from the owner only his right to convert a certain part of his farm land to residential or commercial uses. While he could not add new houses or erect billboards, paralleling pole lines, or other structures, he would continue to exercise all other privileges of ownership and in no way would be restricted in his agricultural pursuits. Neither would the public have any right to enter upon these lands for any purpose. This method of scenic conservation should result in large savings over outright purchase, retire less farm land from the tax rolls, and attach the pastoral views permanently to the parkway without cost to the public for maintenance."

In 1954 Congress referred to the report in appropriating funds to expedite planning of the Great River Road.[3]

In 1955, our legislature amended sec. 84.105, Stats., so that the term "national parkway" now includes the Great River Road or any other parkway projected in general accordance with the 1951 report.[4]

In 1961, the legislature enacted ch. 427, Laws of 1961, creating sec. 15.60, Stats., and other sections. Sec. 15.60 (1) (b) asserted the legislative intent "to authorize the expenditure of approximately $50,000,000 over the next ten years for an outdoor recreation and resource development program." $2,000,000 was allocated "to protect scenic resources along highways." Sec. 20.420 (86) appropriated funds for the "acquisition of scenic easements . . ." Sec. 15.60 (6) allocated priorities for a number of

[3] 1 U. S. Code, p. 95, sec. 14, ch. 181, Public Law 350, 83d Congress.

[4] Ch. 268, Laws of 1955.

park and recreation projects. Sec. 15.60 (6) (i), provided as follows:

"*Scenic easements.* 1. First priority will be given to completing scenic easements along the Great River road. Easements will also be acquired on highways along Lake Michigan and Green Bay, Lake Superior; along the Chippewa, Wisconsin, Fox, Milwaukee and Wolf rivers; in the lake and forest country of northern Wisconsin; and through the Menominee Indian reservation and the Kettle Moraine area."

Although we have found no express statutory definition of "scenic easement," its purpose and general meaning appear from the legislative history just recited. It is also clear that the legislature has determined that the protection of scenic resources along highways is a public purpose, has set the policy of acquiring scenic easements along particular routes, in order to protect such resources, and has delegated to the state highway commission the function of deciding the exact terms of the easements to be acquired, and of exercising the power of eminent domain to acquire them.

The concept of the scenic easement springs from the idea that there is enjoyment and recreation for the traveling public in viewing a relatively unspoiled natural landscape, and involves the judgment that in preserving existing scenic beauty as inexpensively as possible a line can reasonably be drawn between existing, or agricultural (and in these cases very limited residential) uses, and uses which have not yet commenced but involve more jarring human interference with a state of nature. We think both views can reasonably be held.

In *Muench v. Public Service Comm.*[5] where the court dealt with regulation of permits for dams, the court noted the recognition by the legislature that "the enjoyment of

[5] (1952), 261 Wis. 492, 508, 511, 512, 53 N. W. (2d) 514, 55 N. W. (2d) 40.

scenic beauty is a public right," and, in considering the standing of plaintiff to raise issues in that case, said:

"The right of the citizens of the state to enjoy our navigable streams for recreational purposes, including the enjoyment of scenic beauty, is a legal right that is entitled to all the protection which is given financial rights."

Plaintiffs point out that a scenic easement does not permit the public nor any public agency to enter and occupy the lands in person. They contend that physical occupancy is an essential element of a public use, and therefore that a scenic easement is not a public use.

Plaintiffs cite *David Jeffrey Co. v. Milwaukee* [6] which upheld a law authorizing condemnation as part of a procedure for elimination of blighted areas, but which pointed out the distinction between public use of property and incidental benefit derived by the public as a result of private use.

Quotations from other sources appearing in that opinion are as follows:

" 'The public use implies a possession, occupation, and enjoyment of the land' by the public or public agencies, and it is not enough 'that the public would receive incidental benefits, such as usually spring from the improvement of lands or the establishment of prosperous private enterprises.' Cooley's Constitutional Limitations. (7th ed.) 766." [7]

" 'If the constitution means that private property can be taken only for use by the public, it affords a definite guide to both the legislature and the courts. Though the property is vested in private individuals or corporations, the public retain certain definite rights to its use or enjoyment, and to that extent it remains under the control of the legislature. If no such rights are secured to the

---

[6] (1954), 267 Wis. 559, 573, 574, 66 N. W. (2d) 362.

[7] *Smith v. Cameron* (1922), 106 Or. 1, 14, 210 Pac. 716, 27 A. L. R. 510.

public, then the property is not taken for public use and the act of appropriation is void. . . .' " [8]

The learned trial judge succinctly answered plaintiffs' claim that occupancy by the public is essential in order to have public use by saying that in the instant case, "the 'occupancy' is visual." The enjoyment of the scenic beauty by the public which passes along the highway seems to us to be a direct use by the public of the rights in land which have been taken in the form of a scenic easement, and not a mere incidental benefit from the owner's private use of the land.

Plaintiffs appear to contend that the decision, made by the legislature, to preserve scenic resources, and the decision, made by the commission, to take scenic easements, upon certain terms, from plaintiffs involve purely aesthetic considerations. They say that such considerations are "illusory," "whimsical," and "highly controversial," and seem to argue that the legislative decision is therefore meaningless in terms of public interest and that the commission has no standard to follow.

We are aware of the doctrine that zoning restrictions imposed under the police power cannot be based solely on aesthetic considerations, although the court has expressed doubt whether this is any longer the law.[9] Plaintiffs do recognize, of course, that the imposition of restrictions on use involved here is not an exercise of police power. The state is taking a portion of plaintiffs' property rights, and just compensation will be paid for what is taken.

Whatever may be the law with respect to zoning restrictions based upon aesthetic considerations, a stronger argument can be made in support of the power to take property, in return for just compensation, in order to fulfil aesthetic concepts, than for the imposition of police

---

[8] 1 Lewis, Eminent Domain (2d ed.), p. 415, sec. 165.

[9] *State ex rel. Saveland Park Holding Corp. v. Wieland* (1955), 269 Wis. 262, 271, 69 N. W. (2d) 217.

power restrictions for such purposes. More importantly, however, we consider that the concept of preserving a scenic corridor along a parkway, with its emphasis upon maintaining a rural scene and preventing unsightly uses is sufficiently definite so that the legislature may be said to have made a meaningful decision in terms of public purpose, and to have fixed a standard which sufficiently guides the commission in performing its task.

Plaintiffs assert that scenic easements are being taken from owners of agricultural lands along the Great River Road, but for one reason or another will not be taken from the owners of all lands abutting that highway. They point out that the Burlington railroad tracks run between the highway and the river and that there are cities along the highway, where the adjacent property is developed for urban use. They suggest that the highway commission will not take scenic easements from the railroad and from urban owners so as to restrict all those lands to agricultural and limited residential use. Plaintiffs argue that as a result they are being denied equal protection of the laws.

The fact that urban land has been developed for commercial, residential, or similar purposes, and the fact that the railroad property is used for railroad purposes, and those uses cannot readily or economically be destroyed is probably basis enough for classification if a reasonable classification is needed in this context. We consider, however, that once it has been determined that the use for which property rights are taken is a public use, and that the taking is necessary for such use, neither a property owner whose property is taken in return for just compensation nor a property owner whose property is not so taken is in a position to claim that he is denied equal protection of the laws.

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a par-

ticular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." [10]

*By the Court.*—Judgment and order affirmed.

[10] *Berman v. Parker* (1954), 348 U. S. 26, 35, 75 Sup. Ct. 98, 99 L. Ed. 27.